**In re Anonymous Nos. 45 and 46 D.B. 1985**

Disciplinary Board Docket nos. 45 and 46 D.B. 1985.

ECKELL, *Member*, August 8, 1989 —

## HISTORY OF PROCEEDINGS

By order dated May 20, 1985, the Supreme Court of Pennsylvania ordered referral of respondents' criminal convictions to the disciplinary board pursuant to rule 214(f), Pa.R.D.E. No interim suspension was imposed.

The Supreme Court order arose from respondents' criminal convictions of the offenses of hindering apprehension or prosecution in violation of 18 Pa.C.S. §5105(a)(3) and tampering with physical evidence in violation of 18 Pa.C.S. §4910(1). Respondent [1] was also found guilty of criminal soliciation in violation of 18 Pa.C.S. §902 and respondent [2] was found guilty of criminal conspiracy in violation of 18 Pa.C.S. §903.

The background for the charges against and ultimate convictions of respondents arose out of their representation of [A] who had been charged with the crime of murder in [ ] County. As part of their representation of [A], respondents requested the appointment of a private investigator to assist

them in the defense. The Court of Common Pleas of [   ] County granted that petition appointing [B] as investigator. [B] spoke with [A], who told him the facts surrounding the incident giving rise to the murder charge. He told [B] that during an attack on him by the victim, he, [A], struck the victim with a rifle butt which, eventually, caused the victim's death. [A's] defense was self-defense. [A] advised [B] of the location of the rifle butt, and the coat that the victim had worn on the night of his death, as well as the location of two knives the victim had used in his attacks upon [A]. Working together, [A] and [B] prepared a map identifying the location of some of these objects. [B] reported the substance of this conversation to respondents, who instructed him to retrieve all such evidence he could find and return it to respondents.

[B] complied; and, eventually, found the stock or butt of a .22-caliber rifle sticking in a snowbank. He removed the rifle stock from the snow and placed it in his briefcase. He could not recover the other portion of the rifle, because it had been thrown into a creek and the water was too deep; nor was he able to find the knives used in the alleged attack. [B] immediately returned the rifle stock to respondents' law office. Immediately thereafter, respondents walked to the jail, met with [A] and returned to their office with the rifle stock. As a result of that meeting, they knew the rifle stock was the one involved in the crime. Immediately after turning the rifle stock over to respondents, [B] expressed concern as to whether or not he had broken any law regarding withholding evidence of a crime. Respondents advised him not to worry about it because he, together with them, was protected by the attorney/client privilege or words to that effect. Apparently on numerous occasions, [B] expressed concern

about turning the evidence over to the district attorney's office; and respondents repeatedly directed him to maintain secrecy and reassured him that he was protected by the attorney/client privilege.

[B] continued to search for other items described by [A]; and on one occasion, found the coat [A] had described. Coincidentally, a police officer appeared at the scene immediately upon that recovery, and the coat was delivered to the officer by [B].

From the time it was given to them by [B] until several days into the actual trial, respondents kept the rifle stock in their law office, carefully wrapped, and not in any way altered or tested.

While the prosecuting authorities recovered the other portion of the rifle, they did not find the rifle stock. They performed no scientific tests on it, nor on the area where it had been found. The prosecutors did not request respondents to produce any evidence relating to the homicide prior to the fourth day of [A's] trial. At that time, during an in-camera hearing before the trial judge, over respondents' objections, the judge ordered [B] to answer questions propounded by the district attorney concerning any physical evidence he might have found. [B] disclosed that he had found the rifle stock and had turned it over to respondents. Thereupon, the trial judge directed respondents to make the rifle stock available to the commonwealth, to be used by the commonwealth in their case, if they so desired. Respondents immediately produced the rifle stock. However, neither the commonwealth nor respondents introduced the rifle stock into evidence during the trial. These events led to respondents' being charged with, and convicted of, hindering prosecution and tampering with evidence as set forth above.

Following their convictions, respondents timely

appealed to the Superior Court, which by opinion and order dated July 31, 1986, reversed the judgment of sentence.

The basis for the reversal was a determination that the statutes under which respondents were convicted were unconstitutionally overbroad. The court, however, rejected respondents' claim that their actions were proper.

On November 5, 1987, the Pennsylvania Supreme Court entered orders denying both the commonwealth's petition and respondents' cross-petition for allowance of appeal.

A petition for discipline was filed against respondents by the office of disciplinary counsel on April 15, 1988, charging respondents knew or should have known that physical evidence of a crime is not protected by the attorney-client evidentiary privilege and that by removing the rifle stock from its original location and keeping it secreted they were improperly precluding the prosecuting authorities from finding and using that physical evidence against their client. On June 7, 1988, the matter was referred to Hearing Committee [ ] comprised of [ ]. An evidentiary hearing was held on August 18, 1988 and continued on September 9, 1988. The hearing committee filed its report on April 11, 1989 in which the committee unanimously recommended dismissal.

On May 1, 1989, petitioner, disciplinary counsel, filed a brief on exceptions in which objection was taken to the hearing committee's factual findings and conclusions, legal analysis, and recommendation for dismissal. The office of disciplinary counsel argued that the hearing committee's findings were not based upon evidence of record or reasonable inference therefrom. Disciplinary counsel argued that the committee "lost sight of the actual evidence

of record and all the applicable laws and 'bought' the respondent's arguments."

On June 5, 1989, counsel for respondents filed a brief opposing exceptions in which they advocated adopting the hearing committee's recommendation for dismissal. Respondents' counsel argued that [respondents] did not have fair notice in 1982 of the proper course of conduct to follow when confronted with tangible evidence obtained as a result of a confidential communication from their client and under those circumstances [respondents] acted in good faith and followed a reasonable course of conduct. Thus, [respondents] did not violate the Code of Professional Responsibility and acted in a professional and honorable manner.

## FINDINGS OF FACT

The following findings of fact are adopted. They are identical to those stipulated by counsel:

(1) Respondent [1] is an attorney admitted to practice law in the Commonwealth of Pennsylvania, having been admitted on November 30, 1979, with attorney registration no. [ ]. At the time of the instant charges, he was the public defender of [ ] County, maintained a private practice with his brother, respondent [2], at [ ], [ ], Pa., and was approximately 31 years old.

(2) Respondent [2] is an attorney admitted to practice law in the Commonwealth of Pennsylvania, having been admitted on October 29, 1981, with attorney registration no. [ ]. At the time of the instant charges he practiced law in partnership with his brother, respondent [1], at [ ], Pa. under the firm name of "[respondent 1] and [respondent 2]," assisted his brother in handling his duties as public defender, and was approximately 27 years old.

(3) On or about June 14, 1983, respondents were arrested for crimes of hindering apprehension or prosecution (18 Pa.C.S. §5105(a)(3)), tampering with physical evidence (18 Pa.C.S. §4910(1)), and criminal conspiracy (18 Pa.C.S. §903)). Additionally, respondent [1] was charged with criminal solicitation (18 Pa.C.S. §902).

(4) On or about December 30, 1983, special deputy attorney general [C] filed criminal informations against respondents in the Court of Common Pleas of [ ] County. The information against respondent [1] was filed to no. [ ] of 1983 and the information against respondent [2] was filed to no. [ ] of 1983.

(5) The criminal charges against respondents were tried before a jury, presided over by the Honorable [D], [ ] Judicial District, specially presiding, commencing on June 25, 1984 and concluding on June 27, 1984. The jury returned verdicts of guilty as to both respondents on the charges of hindering apprehension or prosecution and tampering with physical evidence. Respondent [1] was found guilty of criminal solicitation and respondent [2] was also found guilty of criminal conspiracy.

(6) On February 8, 1985, Judge [D] imposed identical sentences on both respondents, as follows:

"Sentence of imprisonment suspended; three *concurrent* 12-month periods of probation; and a fine of $750."

(7) Both respondents timely appealed their criminal convictions to the Superior Court of Pennsylvania. The appeal of respondent [1] was docketed to no. [ ], 1985. That of respondent [2] was docketed to no. [ ], 1985. Both were consolidated for consideration.

(8) By order dated May 20, 1985, the Supreme Court of Pennsylvania ordered that the respondents'

criminal convictions "[b]e referred to the disciplinary board pursuant to rule 214(f), Pa.R.D.E." The Supreme Court did not impose any interim suspension.

(9) By opinion and order dated July 31, 1986, a panel of the Superior Court vacated the judgments of sentence and discharged respondents.

(10) On or about August 28, 1986, the Commonwealth of Pennsylvania filed a petition for allowance of appeal with the Supreme Court of Pennsylvania seeking, in essence, a reversal of the Superior Court's determination that the criminal statutes were unconstitutionally overbroad as applied to criminal defense counsel. The commonwealth's petition was filed to no. [  ] W.D. Allocatur Docket 1986.

(11) On September 11, 1986, the respondents filed a cross-petition for allowance of appeal, docketed to no. [  ] W.D. Allocatur Docket 1986. The parties agreed to the submission of respondents' cross-petition for allowance of appeal to the hearing committee.

(12) On November 5, 1987, the Pennsylvania Supreme Court entered orders denying both the commonwealth's petition and respondents' cross-petition for allowance of appeal.

(13) Neither the commonwealth nor the respondents have sought further appellate review of the case and, therefore, all appeals have been concluded.

(14) On or about March 1982, respondents [1] and [2] represented [A] who had been charged with the crime of the murder of [E]. The case was captioned *Commonwealth v. [A]*, no. [  ] of 1982, Criminal Division, Court of Common Pleas of [  ] County.

(15) On or about March 23, 1982, upon petition

by respondents, the [ ] County court appointed [B], a private investigator, to assist respondents in [A's] defense.

(16) On or about March 25, 1982, [B] spoke with [A]. [A] told [B] that both he and [F] (a third person that was involved) were attacked by [E], who was armed with two knives. He told [B] that during the attack [E] was shot, hit by a car and struck with a rifle causing the butt of the rifle stock to break off. Also, [A] told [B] the location of the rifle, the rifle butt, the coat that [E] had worn on the night of his death, the two knives [E] had used in his attacks upon [F] and [A] and other items related to [E's] death. Working together, [A] and [B] prepared a map identifying the location of some of these objects. [B] thereupon, at approximately 10:00 a.m. on March 25, 1982, reported the substance of this conversation to respondent [1] and his brother, respondent [2]. Respondent [1] instructed [B] to immediately retrieve all such evidence and return it to respondents.

(17) On March 25, 1982, [B] proceeded to an area known as [G] near [ ], Pa., and found the stock or butt of a .22-caliber rifle sticking in a snowbank. [B] removed the rifle stock from the snow and placed it in his briefcase. He could not recover the other portion of the rifle, however, because it had been thrown into a creek and the water was too deep. [B] immediately returned with the rifle stock to respondents' law office.

(18) Upon returning to the respondents' law office, [B] presented the rifle stock to respondents who both handled and examined it. Respondents walked to the jail, met with [A] and returned to respondents' office. At that time, respondents knew that the rifle stock was part of the rifle used by their client to strike [E], who had been shot, struck by a

car and then beaten about the head and face with the rifle, breaking the stock from the rest of the gun.

(19) Immediately, [B] expressed concern as to whether or not he had broken any law regarding withholding evidence of a crime. At the time respondents advised [B] not to worry about it because he was protected by the attorney-client privilege, or words to that effect.

(20) Despite [B's] express concerns, respondents directed him to leave the rifle stock in their possession and not to reveal any information about the rifle stock to the prosecuting authorities.

(21) [B] continued to search for other items described by [A]. On one occasion, [B] found the coat described by [A] but immediately turned the coat over to a police officer who appeared at the scene of the recovery shortly after the coat was found. [B] did not find the knives.

(22) From March 25, 1982, until August 19, 1982, repondents kept the rifle stock in their law office.

(23) Throughout the period from March 25, 1982 to August 19, 1982, [B] repeatedly questioned respondents as to the propriety of their conduct in keeping the rifle stock and was advised on a number of occasions that their possession of the rifle stock was covered by the attorney-client privilege, or words to similar effect.

(24) While prosecuting authorities recovered the other portion of the rifle, they did not find the rifle stock and did not conduct any scientific test on it or of the area where it had been found by [B]. The prosecuting authorities did not make a request of respondents to produce any evidence relating to the homicide prior to the fourth day of [A's] murder trial.

(25) On the fourth day of [A's] murder trial, on

August 19, 1982, during an in-camera hearing in Judge [H's] chambers, over objections of respondents, Judge [H] ordered [B] to answer the questions of the district attorney concerning any physical evidence he might have found. At that point, [B] disclosed that he had found the rifle stock and had turned it over to respondents.

(26) Judge [H] immediately directed that "[t]he defense make the [rifle stock] available to the commonwealth in their case if they so desire, and if it can be done properly." Respondents immediately produced the rifle stock. However, neither the commonwealth nor respondents introduced the rifle stock into evidence during the remaining portion of [A's] trial.

The following findings of fact are substantially adopted from the hearing committee's report:

(28) The testimony of respondents in this matter was credible.

(29) All witnesses were honest. However, the testimony of [B] was incorrect in a number of different areas. These conflicts were resolved in favor of respondents.

(30) [F], who was not actively prosecuted, cooperated with the police and identified [A] as the one who struck [E] on the head with the .22 rifle butt, thereby killing him.

(31) Throughout the case [A] admitted to killing [E] but claimed self-defense.

(32) From the beginning to the end of this case, it was clear in the minds of both the prosecutor and the defense counsel that [A] had killed [E] by blows to the head with the .22 rifle. The issue was the degree of guilt, if any.

(33) [F] provided the prosecution with informa-

tion as to the whereabouts of items of physical evidence above referred to, just as [A] advised [B] and respondents.

(34) [B] was a police officer. He temporarily suspended such duties while acting as investigator in the [A] case. He resumed active duty with the police force in approximately August 1983. [B] also had active prosecutions pending with the district attorney's office when he was appointed as defense investigator. The purpose for his appointment was to investigate the alleged crime scene and to look for evidence which might help the defense.

(35) Respondents sought to recover the physical evidence in a good faith effort to provide confirmation of the accuracy of [A's] statements as to the circumstances surrounding the killing and its aftermath.

(36) At the time [B] found the rifle stock it had rained and the rifle stock was protruding from a pile of wet snow. The rifle stock was saturated with water and there was no blood or matter on the stock.

(37) Respondents did in fact come into possession of physical evidence in the [A] case, namely the rifle stock.

(38) Upon receipt of the rifle stock, respondents held the evidence in a manner consistent with its proper preservation and in no way impaired its evidentiary value so as to make it unsuitable for scientific testing.

(39) Respondents never threatened to destroy the evidence and never considered doing anything but properly preserving it, using it as evidence themselves, and in any event dealing with it in a manner consistent with their thoroughly researched understanding of the law.

(40) Immediately after receiving the rifle stock, respondents thorughly researched all potential legal

issues regarding their retaining possession of the rifle stock and their responsibilities relative thereto. The research was limited to Pennsylvania law which had no clear legal precedent concerning their responsibilities.

(41) Respondents made a good faith, reasonable determination under the circumstances based upon their careful review of the existing Pennsylvania case law, Pennsylvania statutes, the U.S. and Pennsylvania constitutions, and the Canons of Ethics that they were under an obligation to retain the evidence rather than voluntarily disclosing its existence and location to the commonwealth.

(42) Respondents' actions were based in part on their reasonable and good-faith reliance on Canon 7 and Ethical Considerations 7-2 and 7-3, which provide in part, in 7-2:

"The bounds of the law in a given case are often difficult to ascertain. The language of legislative enactments and judicial opinions may be uncertain as applied to varying factual situations."

In part from 7-3:

"While serving as an advocate, a lawyer should resolve in favor of his client doubts as to the bounds of the law."

(43) The instructions of respondents to [B] were consistent with their reasonable and good-faith belief as to their duties and obligations to their client and were not intended to obstruct justice, nor did they have that effect.

(44) Respondents, upon receipt of the evidence and thereafter, seriously considered introducing the rifle stock into evidence at trial to bolster [A's] credibility. The disclosure and delivery of the rifle stock during the trial affected the strategies of both the prosecution and the defense. It is speculative to guess whether the stock would have been intro-

duced by respondents had the prosecution not obtained possession of it during the trial but based upon the known facts, we believe it probably would have been.

(45) As early as March 1982, the district attorney of [ ] County knew that [B] was looking for evidence in the [A] case on behalf of respondents.

(46) The district attorney made no requests of nor issued any directives to respondents regarding [B's] investigation or the limits thereof; but rather made a deliberate decision to have law enforcement officers follow [B], which resulted in the retrieving by the prosectution of [E's] coat which [B] succeeded in locating.

(47) The district attorney, by virtue of his knowledge and acquiesence, tacitly agreed to [B's] removal of items from the locations at which he might find them. The district attorney proceeded in good faith in this regard based upon a reasonable certainty that [B], a police officer, would properly handle evidence so as not to impair its evidentiary value and would, upon lawful request, accurately provide information regarding any such item, in the same manner as would any other competent police officer.

(48) The district attorney of [ ] County knew or should have known that respondents had knowledge of the location of physical evidence in the [A] case, and further knew or should have known that respondents may have acquired physical evidence of the crime, including the rifle stock.

(49) Had the district attorney of [ ] County needed additional physical evidence to prosecute [A] properly, he would have requested it from respondents in advance of trial.

(50) Had such lawful request been made in

advance of trial, the rifle stock would have been delivered to the commonwealth by respondents.

(51) Respondents did not knowingly engage in illegal conduct or conduct contrary to a disciplinary rule, in fact, under the circumstances, respondents conducted themselves in a professional and honorable manner.

## DISCUSSION

In reviewing disciplinary proceedings de novo, the board often must make factual determinations in order to assess the applicability of various disciplinary rules. This case is somewhat unique in that there is no factual dispute. Respondents have admitted the conduct which disciplinary counsel contends is the foundation supporting the charges of violation of six disciplinary rules. On the other hand, respondents assert that after analyzing current Pennsylvania law and the Canons of Ethics, they were under an obligation to follow the conduct they pursued; namely they were under an obligation to retain the evidence rather than voluntarily disclose its existence and location to the commonwealth. The issue before the board is whether respondents' conduct constituted a violation of any disciplinary rule of the Code of Professional Responsibility; and furthermore what appropriate discipline should be imposed, if any. The hearing committee has recommended dismissal.

Since the issue before the board is one of first impression, the board is guided in part by the holding and reasoning of the Superior Court of Pennsylvania in *Commonwealth v. [Respondents]*. In the *[Respondents]* case the Superior Court was presented with the following difficult issue:

"Is a criminal defense attorney obligated to pro-

vide a prosecutor with a tangible object that potentially is evidence against the client where the object was obtained in furtherance of the defense as a result of a confidential communication from the client, and where disclosure would have testimonial aspects incriminating to the client?"

Underlying this issue are complex policies which are inherently at odds with each other: The accused's Fifth Amendment right versus the truth-seeking function of the judicial system; attorney-client privilege versus public interest in criminal investigation; and the attorney's duty to zealously defend his client versus the attorney's duty as an officer of the court. Although the Superior Court discussed these significant policies, the court did not explain its decision in terms of balancing policies. Instead, the court held the statutes under which the [respondents] were convicted were unconstitutionally overbroad as applied to criminal defense attorneys; thus respondents had been denied due process.

However, the Superior Court rejected [respondents'] contention that their conduct was proper and that they had no duty to deliver the rifle stock to the prosecution until they were ordered to do so. The board adopts the reasoning of the hearing committee as stated in their carefully and concisely done report:

"We think that the court made a deliberate decision to use the word 'proper' rather than 'lawful' in writing the decision. What the Superior Court held, we believe, is that respondents, faced with a dilemma, made an incorrect, but not unlawful decision. This conclusion on our part is bolstered by the fact that the criminal convictions were overturned."

In reaching its decision, the Superior Court also adopted a prospective rule that defense attorneys

may return the physical evidence to its source if they can do so without impeding the prosecution. Otherwise, the defense attorney has a duty to turn over the evidence to the prosecution and concomitantly, the prosecution may not disclose to the factfinder the source of evidence. *Commonwealth v. [Respondents], supra.* This rule seeks to protect the constitutional rights of the accused while also protecting the public's interest in criminal investigation. However, it is a prospective rule. Such guidance was not available to the [respondents] in 1982 when they were confronted with their dilemma. Had respondents given the evidence to the district attorney, their client would not have been protected because there was no rule in existence at that time in the Commonwealth of Pennsylvania preventing the prosecution from advising the jury that it had received the evidence from the accused's lawyer. Such a potential disclosure to the jury placed the [respondents] in an ethical dilemma in which they either had to retain the evidence and neglect their duty as officers of the court or hand over the evidence and forfeit their client's Fifth Amendment right against self-incrimination. This dilemma did not arise from any type of self-enrichment or wrongful intent. Rather, the dilemma arose from respondent's good-faith efforts in zealously defending their client as required by Canon 7 of the Code of Professional Responsibility. Respondents' actions were also based in part on their reasonable reliance on Ethical Consideration 7-3 which states:

"While serving as an advocate, a lawyer should resolve in favor of his client doubts as to the bounds of the law."

Respondents reasonably relied on Ethical Consideration 7-3 because they had no clear guiding precedent to assist them in a determination of what

course of conduct they should pursue. The board recognized and considered the difficult situation in which respondents found themselves. The Superior Court adequately explained the problems and difficulties respondents faced when searching for a solution:

"Beyond the obvious example stated above, there is little or no guidance for an attorney to know when he has crossed the line into an area of criminal behavior. There are no prior cases in this jurisdiction in which a criminal defense attorney has been convicted of violating these statutes. We have discussed many of the similar cases from other jurisdictions, none of which addresses the precise issues facing us in this case. Although we focused on the uniformity we found in those cases as to disposition of physical evidence, they express a great deal of doubt and reflect great diversity as to the grayer areas of ethical usage of evidence of all sorts. Attorneys face a distressing paucity of dispositive precedent to guide them in balancing their duty of zealous representation against their duty as officers of the court. Volumes are filled with other potential sources of guidance, such as ethical codes and comments thereto, both proposed and adopted, advisory opinions by ethics committees and myriad articles in legal periodicals. The plethora of writings exemplifies the profession's concern with the problem, and although they may help to clarify some of the issues, they fail to answer many of the difficult questions in this area of legal practice." *Commonwealth v. [Respondents], supra.*

The board also has considered and accepted the testimony of [I], law professor and expert on the subject of criminal defense ethics. Professor [I] testified from an objective standpoint and explained

the ambiguous nature of the provisions of Canon 4 and Canon 7 when taken together:

"The first rule that would be significant is in the Code of Professional Responsibility, Disciplinary Rule 7-102(A)(3) which states, 'in his representation of a client, a lawyer shall not conceal or knowingly fail to disclose that which he is required by law to reveal.' In and of itself, that appears to be a clear statement, but it raises two problems when read in context with other rules. [One problem] is whether or not the reference 'by law' [in rule 7-102(A)(3)] is a reference to the criminal law or legal process [meaning] a subpoena or a court order to produce evidence. [The second problem] is that it is clear from other parts of the code that [this rule] does not apply across the board. [Rule 7-102(A)(3)] does not apply when a client has spoken to his criminal defense attorney and given him confidential communications. [As required by Canon 4 which states a lawyer should preserve the confidence and secrets of a client.] In other words, even though that can be seen as evidence of the crime, there is no obligation for the defense attorney to turn on his client and reveal those confidences."

In his deposition on September 9, 1988, Professor [I] stated that given the code provisions that address the issue, and the various statutes and constitutional provisions, [respondents] took a reasonable position in their belief that they did not have an obligation to hand over the rifle stock until they were ordered to do so by the court. The board agrees. However, disciplinary counsel contends that respondents did not act reasonably and did not make even the minimal efforts to solve their dilemma. Disciplinary counsel suggests that respondents could have easily phoned either or both the ethics committees of the American Bar Association

or the Pennsylvania Bar Association for guidance. The board concludes that respondents did, in fact, make a good-faith, reasonable determination based upon careful review of the existing Pennsylvania law, statutes, constitution, and the Canon of Ethics. Calling an ethics committee was not the panacea to their dilemma. The board adheres to the reasoning of the Superior Court in the *[Respondents]* case:

"Two cases cited in the previous section involved attorneys who had sought advisory opinions from ethics committees when confronted with problems related to disposition of physical evidence. Their action was salutory, but underscores the dilemma facing criminal defense attorneys in similar situations. Not only is the resort to guidance from an ethics committee a time-consuming process, it is a process totally inconsistent with the precision which must attend a valid criminal statute to inform its subjects of what specific behavior is proscribed." *Commonwealth v. [Respondents], supra.*

As stated by the Supreme Court in *Office of Disciplinary Counsel v. Keller,* 509 Pa. 753, 579, 506 A.2d 872, 875 (1986), the primary purpose of our system of lawyer discipline is to protect the public from unfit attorneys and to maintain the integrity of the legal system. The conduct of respondents in this case did not and could not in any way defeat this primary purpose, namely protecting the public from unfit attorneys. Respondents made a good-faith effort to balance their duties to their client against their duties owed to the court as officers. By retaining the evidence, respondents protected their client's constitutional rights and by not tampering or destroying the evidence and keeping the evidence where it could be readily recovered upon lawful request, respondents served their duty to the court. Respondents relied on Ethical Consid-

eration 7-3 and resolved in favor of their client doubts as to the bounds of the law. The only thing respondents can be accused of is zealously defending their client. However, the zealous advocate is necessary to an adversary system of justice as stated by both our Superior Court and the Supreme Court of the United States:

"Not only is effective assistance of counsel a constitutional mandate, it is also necessary to an adversary system of justice. Assuredly, counsel's assistance can be made safely and readily available only when the client is free from the apprehension of disclosure." *Commonwealth v. [Respondents]*, citing *In re Gartly*, 341 Pa. Super. 350, 491 A.2d 851, 859-60 (1985).

"We note also that the lawyer's role as a zealous advocate is an important one, not only for the client but for the administration of justice. We have chosen an adversary system of justice in which, in theory, the state and the defendant meet as equals—'strength against strength, resource against resource, argument against argument.'" *Commonwealth v. [Respondents]*, citing *United States v. Bagley*, 473 U.S. 667, 670, 105 S.Ct. 3375, 3390, 87 L.Ed. 2d 481, 486 (1985) (Marshall, *J.*, dissenting).

A review of the facts found by the hearing committee will demonstrate that maintenance of the integrity of the legal system did not require respondents to turn over the evidence to the district attorney. The district attorney knew or should have known that respondents had knowledge of or may have acquired physical evidence of the crime. The district attorney did not make any requests to respondents to turn over evidence before the trial. More importantly, a conviction was obtained without the use of the rifle stock as evidence; and the district attorney chose not to put the rifle stock into

evidence after respondents delivered it to the court, despite the fact the district attorney had the means to do so. Thus, the integrity of the legal system was maintained because there was no reason to believe the evidence was of importance to the resolution of a disputed fact or the successful prosecution of respondent's client.

## CONCLUSIONS

The board unanimously agrees with the conclusion of the hearing committee that respondents did not violate any of the disciplinary rules of the Code of Professional Responsibility alleged in the petition for discipline. Specifically:

(A) Respondents did not circumvent any disciplinary rule through the actions of any person (D.R. 1-102(A)(2));

(B) Respondents did not engage in conduct prejucicial to the administration of justice (D.R. 1-102(A)(5));

(C) Respondents did not engage in conduct which reflected adversely on their fitness to practice law (D.R. 1-102 (A)(6));

(D) Respondents did not conceal or knowingly fail to disclose anything which they were required by law existing in Pennsylvania at that time to reveal (D.R. 7-102(A)(3));

(E) Respondents did not knowingly engage in illegal conduct or conduct contrary to a disciplinary rule (D.R. 7-102(A)(8)); and

(F) Respondents did not "suppress" any evidence which they or their client had a legal obligation to reveal or produce (D.R. 7-109(A)). Rather they held it in safekeeping and delivered it immediately upon lawful request.

## RECOMMENDATION

The disciplinary board unanimously recommends that the petition for discipline filed against [respondent 1] and [respondent 2] be dismissed.

Messrs. Douglas, Gilardi and Stoelker and Ms. Heh did not participate in the adjudication.

## ORDER

MUNDY, *Chairman* — And now, August 8, 1989, upon consideration of the report and recommendation of Hearing Committee [   ] filed April 11, 1989; it is hereby ordered and decreed, that the charges against [respondent 1] and [respondent 2] be dismissed.